

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 14, 2016

## STATE OF TENNESSEE v. RADAMES ANTONIO RIVERA

**Appeal from the Circuit Court for Montgomery County**
**No. 41400336      Jill Bartee Ayers, Judge**

———————————————————

## No. M2016-00938-CCA-R3-CD

———————————————————

The defendant, Radames Antonio Rivera, was indicted for one count of first degree murder, one count of attempted tampering with evidence, and one count of unlawful possession of a weapon. Following trial, the jury found the defendant guilty of one count of second degree murder. The trial court sentenced the defendant to fifteen years of incarceration. On appeal, the defendant argues the evidence was insufficient to support his conviction. After our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed.**

J. Ross Dyer, J., delivered the opinion of the court, in which D. Kelly Thomas, Jr., and Camille R. McMullen, JJ., joined.

Gregory Smith, Clarksville, Tennessee, for the appellant, Radames Antonio Rivera.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; John W. Carney, District Attorney General; Robert Nash and Art Bieber, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### *Factual and Procedural History*

Shortly after 2:00 a.m. on March 16, 2014, the defendant stabbed Darrell Ray Willis in the parking lot of Wild Woody's Saloon ("the bar") in Clarksville, Tennessee. At trial, the State presented a number of witnesses who were present during the incident. Their accounts were largely consistent with regard to the events surrounding the stabbing. Those witnesses present during the offense and who testified for the State at trial were:

Ashlee Hughes, Michael Stewart, Candice Corbin, Derrick Douglas, James Wilbur, Shane Cortez, and Adam Zacharzuk.

The defendant and victim were members of two separate groups who had participated in a "pub crawl" in celebration of St. Patrick's Day. A "pub crawl" is an event where individuals are transported, usually by foot or public transportation, to various bars and clubs in a single night for the purpose of consuming alcohol. The two groups visited several different bars the night of March 15, 2016, before ultimately ending up at the bar. Inside the bar, an altercation arose between members of the defendant's group and members of the victim's group over a perceived slight. Bouncers, employed by the bar, removed the individuals responsible for the altercation to the parking lot outside. The scene outside the bar was chaotic, with multiple fights going on at various locations throughout the parking lot.

To the left of the entrance to the bar, a fight broke out between female members of the two groups. To the right of the entrance to the bar, Marcus Harley and the victim were fighting and struggling on the ground. During the struggle, the victim was "jumped" and "beat up" by approximately five individuals. At this point, the defendant was standing alone ten to fifteen yards away observing the altercation. The defendant pulled a knife from his pocket and opened it. An unidentified female grabbed the defendant's arm, attempting to stop him. The defendant shrugged her off and walked quickly across the parking lot to where the victim was crouched defending himself. The defendant plunged his arm into the pile of people, stabbing the victim in the chest. The defendant stated, "This is what y'all motherf**kers wanted," and "yeah motherf**ker." The victim fell backwards onto the pavement, and the defendant backed away in between the rows of parked cars. The defendant bent down and dropped the knife near a white sedan.

Officer Matthew Ferrell of the Clarksville Police Department testified he responded to the disturbance at the bar. When he arrived, Officer Ferrell observed a large group of individuals fighting with one individual lying on the ground. Officer Ferrell first broke up the fights and then attempted to render aid to the victim. Officer Ferrell located a stab wound to the victim's chest and continued to render aid until an ambulance arrived.

Officer Gary Mefford of the Clarksville Police Department also testified that he responded to the call at approximately 2:25 a.m. on March 16, 2014. Officer Mefford located a knife lying thirty feet from the victim next to a car. He secured the area until the Crime Scene Team arrived.

Officer Scott Beubien, a member of the Clarksville Police Department Crime Scene Team, created a sketch of the crime scene and measured the distance between certain pieces of evidence. Officer Beaubien's sketch was entered as an exhibit at trial. Officer Beaubien recovered four pieces of evidence from the parking lot: 1) a yellow shirt; 2) a black shirt; 3) samples from two "red brown" blood stains located on the surface of the pavement; and 4) a knife. The two shirts and blood stains were located directly in front of the bar's entrance. The knife was located across the parking lot from the other items of evidence on the ground next to a Toyota Corolla.

Officer Darren Koski of the Clarksville Police Department testified he was called at home to respond to the bar's parking lot on March 16, 2014. Officer Koski is a member of the Crime Scene Unit and was responsible for collecting evidence from the scene. Officer Koski collected a yellow shirt and a black shirt from the bar's parking lot.

Detective Christopher Nolder, a detective in the homicide unit of the Clarksville Police Department, testified he was the lead investigator in the defendant's case. The State identified and entered several exhibits through Detective Nolder, including 911 calls, videos from the inside of the bar, one pair of black jeans recovered from the defendant, one white shirt recovered from the defendant, two buccal swabs taken from the defendant, one blood spot sample from the victim, and a gray hat recovered from the bar. Detective Nolder testified the knife recovered from the parking lot of the bar had a blade length of three-and-a-half inches. It was a folding knife that allowed the user to lock the blade in place when fully extended. The defendant was legally allowed to carry the knife because it was shorter than four inches. Detective Nolder interviewed the defendant, and the interview was audio and video recorded.

Special Agent Brock Proctor of the Tennessee Bureau of Investigation, a forensic scientist in the serology and DNA unit, testified that he created a DNA profile of the defendant using two buccal swabs. He also created a DNA profile using a blood spot taken from the victim. Agent Proctor tested the brown shirt and the yellow shirt recovered from the crime scene for the presence of DNA. He obtained a positive match on both shirts for the presence of the victim's DNA. Agent Proctor also tested the blade and handle of the knife recovered from the scene. He obtained a positive match for the victim's DNA on the blade of the knife. The test he conducted on the handle of the knife showed the presence of DNA from a number of contributors but was inconclusive as to their identity.

Agent Proctor tested multiple samples from a shirt recovered from the defendant for the presence of human DNA. He tested a stain on the left sleeve of the defendant's shirt, which was negative for both the defendant and the victim's DNA. Agent Proctor

also tested a stain from the left cuff of the defendant's shirt. This sample was positive for human blood and contained DNA from several sources. The major contributor to the DNA found on the cuff of the defendant's shirt was the victim. Finally, Agent Proctor tested a gray hat recovered from the bar for the presence of human DNA. He obtained a positive match for the defendant's DNA from the hat. Special Agent Proctor compiled a report of his findings, which was entered into evidence at trial.

Dr. David Zimmerman, a Davidson County medical examiner, performed the autopsy on the victim Darrell Willis. Initially, Dr. Zimmerman noted a number of injuries to the victim, including: a stab wound to the victim's chest; abrasions on the back of the victim's head, arms, and legs; and a bruise to his right hand. The stab wound located on the right side of the victim's chest was one inch long and one-sixteenth of an inch wide. The wound had a blunted edge on the right side and a v-shaped edge on the left. The knife recovered from the scene had a blunted edge and a v-shaped edge. Dr. Zimmerman explained the angle of the wound was slightly downward away from the victim's neck and towards the victim's stomach. The knife entered the chest traveling towards the victim's back. The wound penetrated the right atrium of the heart. Dr. Zimmerman noted there were 140 milliliters of blood within the heart itself and 1700 milliliters of blood within the chest.

Dr. Zimmerman also conducted a toxicology report on the victim and observed the presence of alcohol in the victim's blood. Multiple blood samples were taken and indicated the victim's blood alcohol content was between .13 and .152 one hour before his death. Depending on the victim's tolerance, that level of intoxication could cause slurred speech, stumbling, poor judgment, reduced reaction time, and a slowed breathing rate. Dr. Zimmerman concluded the cause of death was a single stab wound to the chest, and the manner of death was homicide. He prepared a report of his findings which was entered as an exhibit at trial.

After the State rested its case in chief, Severina Tugati testified she was with the defendant's group at the bar on the morning of March 16, 2014. Ms. Tugati and the other members of her party, including the defendant, arrived at the bar around 1:00 a.m. Shortly after they arrived, Ms. Tugati noticed a fight had broken out between her boyfriend Marcus Harley and another individual. Ms. Tugati testified she blacked out and could not recall how the altercation ended up outside. Outside, she recalled calling 911 and speaking to the dispatcher. Meanwhile, she noticed to her left Brianna Glatt was on the ground. According to Ms. Tugati, two females and two or three males were stomping on Ms. Glatt.

- 4 -

Kevin Kennedy, another friend of the defendant, testified he met the defendant, and the rest of their group, after leaving work on March 15, 2014. An altercation arose inside the bar and eventually moved to the parking lot outside the bar. According to Mr. Kennedy, the victim Darrell Willis had Brianna Glatt in a "UFC chokehold" on the ground. Mr. Kennedy tried to get the victim off of Ms. Glatt and then attempted to break up several other fights that were going on throughout the parking lot. He estimated there were approximately fifteen people in the parking lot outside of the bar. The victim was running around fighting different people; Mr. Kennedy, however, did not remember the victim and the defendant ever fighting with each other.

The defendant testified in his own behalf. After arriving at the bar, Ricky Douglas approached Marcus Harley and the two engaged in a heated conversation. The defendant grabbed Mr. Douglas's shoulder in an attempt to move him away from Mr. Harley. Mr. Douglas shoved the defendant and attempted to punch him but missed. The defendant then attempted to punch Mr. Douglas but was grabbed from behind. Mr. Harley then punched Mr. Douglas. The bouncers broke up the fight and escorted Mr. Harley outside. The defendant was trying to reach Mr. Harley in order to leave, when someone grabbed him from behind again and threw him to the floor.

After the defendant was able to stand up, he went outside and observed Brianna Glatt fighting two other females – one with blonde hair and one wearing a green dress. To the right of the bar's entrance, the victim and three or four individuals were attacking Mr. Harley. At this point, the defendant admitted he was in no danger, standing alone, and no one was confronting him. He testified he was standing back, looking around, and "trying to see where [he] was needed."

The defendant started walking towards the group where the victim was located when Shane Cortez approached him with clenched fists. The defendant pulled a knife from his pocket, intending to intimidate Mr. Cortez. Mr. Cortez ran and told the bouncers that the defendant had a knife. Mr. Cortez then ran back and stood between the defendant and where the victim was involved in an altercation with Mr. Harley. The defendant was holding his knife in his right hand down at his side. Mr. Cortez attempted to hit the defendant but missed. The defendant raised his knife to chest level and said "back the f**k up." In his peripheral, the defendant noticed someone moving quickly toward him and turned to see the victim rushing towards him. The defendant explained as he turned the knife just went in "it was kind of like we met." The defendant was in shock and backed away, tossing the knife under a nearby car. The defendant testified he regretted taking the knife out and felt it was a poor decision in hindsight. He stated he never intended to kill the victim. Following the defendant's testimony, the defense rested its case.

The jury returned a verdict finding the defendant guilty under Count 1 of the lesser-included offense of second degree murder. The trial court granted a motion for judgment of acquittal with respect to Count 2, tampering with evidence, and the State dismissed Count 3, unlawful possession of a weapon. At the sentencing hearing on March 11, 2015, the trial judge sentenced the defendant to fifteen years' incarceration.

On March 17, 2015, the defendant filed a motion for new trial, and on February 22, 2016, he filed an amended motion for new trial. Following a hearing, the trial court denied the defendant's motion and this timely appeal followed. On appeal, the defendant argues the evidence was insufficient to support his conviction for second degree murder because he acted under adequate provocation. The State argues the evidence was sufficient to support the defendant's conviction. After a thorough review of the record and applicable law, we affirm the judgments of the trial court.

*Analysis*

Sufficiency of the Evidence

The defendant argues the evidence presented at trial was insufficient to support his conviction for second degree murder. The defendant does not dispute he stabbed the victim in the chest with a knife. Instead, he argues the killing was not murder because it was committed in the heat of passion during mutual combat; therefore, the evidence was only sufficient to support a conviction for voluntary manslaughter.

When a defendant challenges the sufficiency of the evidence on appeal, the relevant question for the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Evans*, 838 S.W.2d 185, 190-91 (Tenn. 1992) (citing *Jackson v. Virginia*, 443 U.S. 307 (1979)). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Papas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle,* 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews,* 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown,* 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State,* 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes,* 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson,* 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell,* 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State,* 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence. *Dorantes,* 331 S.W.3d at 379 (citing *State v. Rice,* 184 S.W.3d 646, 662 (Tenn. 2006)). The extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Id.* This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.*

Count One Second Degree Murder

Second degree murder is a knowing killing of another. Tenn. Code. Ann. § 39-13-210(a)(1). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. 39-11-302(b). Whether the defendant knowingly killed the victim is a question of fact for the jury. *State v. Inlow,* 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000). Because of the difficulties inherent in proving intent through direct evidence, intent may be inferred by the jury from "the character of the assault, the nature of the act and from all the circumstances of the case in evidence." *Id.* at 105 (*citing State v. Holland*, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1983)).

Voluntary manslaughter is "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). "Whether a knowing killing resulted from 'a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner' is a jury question." *State v. Williams*, 38 S.W.3d 532, 539 (Tenn. 2001) (*quoting State v. Johnson*, 909 S.W.2d 461, 463-64 (Tenn. Crim. App. 1995)). It is within the sole purview of the jury, therefore, to determine whether the defendant knowingly committed second degree murder or acted under adequate provocation. *Id.*

- 7 -

In this case, the jury was presented with evidence that the victim's death was the result of an altercation between members of the defendant's group and members of the victim's group. Although the various accounts presented at trial are not completely consistent, it appears the incident started when Ricky Douglas, a member of the victim's group, engaged in a heated exchange with the defendant and Marcus Harley. At some point during the fight, the defendant was grabbed from behind twice and thrown to the ground. The bouncers at Wild Woody's Saloon removed the two groups from the bar, and the fighting continued in the parking lot outside. According to a number of witnesses, including Ms. Candice Corbin and bouncer Adam Zacharzuk, either four or five people were hitting the victim as he crouched to protect himself from the blows. Multiple witnesses and the defendant himself testified that the defendant was standing away from the fight, out of harm's way, when he pulled a knife out of his pocket. One of the bar's bouncers even indicated the defendant was observing the fight from thirty to forty-five feet away.

The defendant admitted he stabbed the victim. He alleges, however, that the stabbing was done in the heat of passion during mutual combat and, therefore, could only support a conviction for voluntary manslaughter. The defendant testified the victim "bull-rushed" him from the side, and as the defendant turned to defend himself, the knife went into the victim's chest. The defendant's version of events was contradicted by almost every other witness at trial.

No other witness corroborated the defendant's story that he was "bull-rushed" by the victim. On the contrary, one consistent aspect of the various witness' accounts was that the defendant was not near the altercation with the victim. Nearly every witness testified that the defendant was standing at a distance and moved quickly towards the victim holding a knife in his right hand. The defendant himself admitted he was observing the altercations from a distance in order to determine where he was needed. A female grabbed the defendant, apparently attempting to stop him from entering the altercation. However, he shrugged her off and walked at a fast pace toward the fight where the victim was located. Multiple witnesses described how the defendant plunged his arm into the pile of people stabbing the victim in the chest. Witnesses also heard the defendant state "this is what y'all mother**kers wanted," as he backed away from the dying victim. Additionally, Dr. Zimmerman, the medical examiner who performed the autopsy of the victim in this case, testified that the angle of the stab wound was slightly downward, consistent with the victim being in a crouched position.

The jury was under no obligation to accept the defendant's testimony. The jury alone evaluates the credibility of the witnesses, determines the weight given to those witnesses' testimony, and reconciles all conflicts in the evidence. *Campbell,* 245 S.W.3d

at 335. Evidenced by the jury's verdict, the jury did not find the defendant's version of events to be credible, and this Court will not substitute its own conclusions for theirs. The evidence presented at trial was more than sufficient to support the defendant's conviction for second degree murder. The defendant, therefore, is not entitled to relief.

*Conclusion*

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
J. ROSS DYER, JUDGE